**RECORD NO. 15-1159**

In The

# United States Court Of Appeals

## For The Fourth Circuit

### SCOTT M. GRIFFIN,

*Plaintiff – Appellee,*

v.

### PAUL E. WALKER, JR.;
### CAROLINA SELF STORAGE CENTERS, INC.,

*Defendants – Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT CHARLESTON**

————————————

**BRIEF OF APPELLANTS**

————————————

Kathleen C. Barnes
BARNES LAW FIRM, LLC
P. O. Box 897
Hampton, SC  29924
(803) 943-4529

*Counsel for Appellants*

Gibson Moore Appellate Services, LLC
421 East Franklin Street ♦ Suite 230 ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO

2.     Does party/amicus have any parent corporations?                     YES     NO
       If yes, identify all parent corporations, including grandparent and great-grandparent
       corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                         YES     NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?        YES      NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                          YES      NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____         Date: _____

Counsel for: _____

# CERTIFICATE OF SERVICE
**************************
I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____          _____
(signature)                                                          (date)

# **TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE................................................................1

    Statement of Facts............................................................................2

        I.    Griffin's Pre-Foreclosure Attempt to Secure a Purchase of the Property from the Bank .......................................2

        II.    Walker Purchased the Property at the Foreclosure Sale............6

        III.    The Contract Between Griffin and Walker................................6

        IV.    Walker's Non-Performance of the Contract Due to Public Policy Violations and Misrepresentations .................9

        V.    The District Court's Decision to Grant Griffin's Summary Judgment Motion and Deny Walker and Carolina Self Storage's Summary Judgment Motion ...............11

SUMMARY OF THE ARGUMENT .....................................................12

ARGUMENT ........................................................................................13

    Standard of Review........................................................................13

        I.    Griffin Cannot Establish the Elements of Specific Performance........13

        A.    The Contract is Invalid as Against South Carolina Public Policy..........................................................14

B.    Griffin Did Not Partially Execute the Contract with Approval by Walker ................................................................20

II.    The District Court Incorrectly Balanced the Equities ........................23

CONCLUSION ........................................................................................26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>:

## <u>Cases</u>:

*Amick v. Hagler*,
    286 S.C. 481, 334 S.E.2d 525 (Ct. App. 1985) .............................................23

*Bouchat v. Baltimore Ravens Football Club*,
    346 F.3d 514 (4th Cir. 2003) .......................................................................21

*Ingram v. Kasey's Assocs.*,
    340 S.C. 98, 531 S.E.2d 287 (2000) ......................................................14, 20

*King v. Oxford*,
    282 S.C. 307, 318 S.E.2d 125 (Ct. App. 1984) .............................................23

*Libertarian Party of Va. v. Judd*,
    718 F.3d 308 (4th Cir. 2013) .......................................................................13

*Lowcountry Open Land Trust v. Charleston S. Univ.*,
    376 S.C. 399, 656 S.E.2d 775 (Ct. App. 2007) .............................................24

*Milliken & Co. v. Morin*,
    399 S.C. 23, 731 S.E.2d 288 (2012) .............................................................14

*Richard B. Smith Real Estate v. Knudson*,
    691 P.2d 1212 (Idaho 1984) .......................................................................19

*Shay v. Austin*,
    466 F. Supp. 2d 664 (D.S.C. 2006) .............................................................22

*Spence v. Spence*,
    368 S.C. 106, 628 S.E.2d 869 (2006) ...........................................................26

*Triton Marine Fuels Ltd., S.A. v. M/V Pacific Chukotka*,
    575 F.3d 409 (4th Cir. 2009) .......................................................................13

*United States v. St. Louis Univ.*,
    336 F.3d 294 (4th Cir. 2003) .......................................................................13

*White v. J.M. Brown Amusement Co.*,
    360 S.C. 366, 601 S.E.2d 342 (2004) .................................................... 14-15

*Worrell v. Lathan*,
    324 S.C. 368, 478 S.E.2d 287 (Ct. App. 1996) ............................................19

**<u>Statutes</u>:**

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1332 ...........................................................................................1

S.C. Code Ann. § 40-1-110 ...........................................................................16

S.C. Code Ann. § 40-1-110(1)(d) ..................................................................16

S.C. Code Ann. § 40-1-110(1)(e) ...................................................................16

S.C. Code Ann. § 40-57-10 ............................................................................15

S.C. Code Ann. § 40-57-60(2) ........................................................................15

S.C. Code Ann. § 40-57-140(A) .....................................................................19

S.C. Code Ann. § 40-57-145 ...........................................................................16

S.C. Code Ann. § 40-57-230 ...........................................................................16

S.C. Code Ann. § 40-57-240(1) .......................................................................15

S.C. Code Ann. § 47-50-30(6) .........................................................................15

**<u>Other</u>:**

17B C.J.S. *Contracts* § 1030 ..........................................................................14

38 Am. Jur. 2d *Gifts* § 66 ...............................................................................19

iv

## JURISDICTIONAL STATEMENT

Appellee invoked the District Court's subject matter jurisdiction by filing this action pursuant to 28 U.S.C. § 1332 on the basis of complete diversity of citizenship. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The District Court entered final judgment by denying Appellants' motion for reconsideration on January 16, 2015. Appellants timely filed a Notice of Appeal on February 16, 2015.

## STATEMENT OF THE ISSUES

I.  **WHETHER THE DISTRICT COURT ERRED IN FINDING THE CONTRACT ENFORCEABLE WHEN PERFORMANCE OF THE CONTRACT EXPOSES WALKER TO CIVIL LIABILITY AND PROFESSIONAL DISCIPLINARY ACTION UNDER SOUTH CAROLINA STATUTES?**

II.  **WHETHER THE DISTRICT COURT ERRED IN FINDING GRIFFIN PARTIALLY EXECUTED THE CONTRACT WHEN THE RECORD IS WITHOUT EVIDENCE OF PARTIAL EXECUTION PRIOR TO WALKER'S REFUSAL TO PERFORM UNDER THE CONTRACT?**

III.  **WHETHER THE DISTRICT COURT ERRED IN BALANCING THE EQUITIES BETWEEN THE PARTIES WHEN ITS HOLDING IS BASED ON INCORRECT ASSUMPTIONS THAT SUBSTANTIALLY ALTER THE TERMS OF THE CONTRACT?**

## STATEMENT OF THE CASE

This is an action involving the enforceability of a contract for the sale of approximately 609 acres of real property in Colleton County, South Carolina (the "Property"). In late September 2013, Appellee Scott M. Griffin submitted a contract to Enterprise Bank to purchase the Property, which was in foreclosure and

1

scheduled for auction at a foreclosure sale on October 7, 2013.  Griffin believed the Bank would get the Property at the foreclosure sale and he would, in turn, buy it from the Bank.  In an unexpected turn of events, Appellant Paul E. Walker, Jr., made the high bid at the foreclosure sale and obtained title to the Property.

Later that same day, Griffin entered into a contract to purchase the Property from Walker.  Walker later refused to perform under the contract when he realized that performance exposes him to civil liability and disciplinary action from the South Carolina Real Estate Commission because it misrepresents the purchase price and requires a commission payment to an uninvolved realty company. Griffin filed an action for specific performance of the contract.  Walker and Appellant Carolina Self Storage Centers, Inc., filed a declaratory judgment counterclaim seeking a ruling that the contract is unenforceable.  The parties filed cross motions for summary judgment.  The District Court decided the motions without a hearing.  It granted Griffin's motion and denied Appellants' motion. Appellants filed a motion to alter or amend the judgment, which the District Court denied.  Appellants challenge both Orders on appeal.

## Statement of Facts

### I.    Griffin's Pre-Foreclosure Attempt to Secure a Purchase of the Property from the Bank

Griffin lives in North Carolina and is a partner in numerous businesses, including a concrete company and two masonry companies. (JA 36-37).  He serves

2

as the president of one of the masonry companies, which averages "39 million in revenue and [has] about 450 employees." (JA 36-37).

Griffin began looking for "a piece of recreational property for entertainment, for client building, client relationships, entertaining family, personal [use], [and a] hunting tract." (JA 38 lns. 1-5).  For several years Griffin looked at land with a realtor named Tyler Stone, who works for National Land Realty. (JA 39).  Griffin did not have an exclusive buyer's contract with National Land Realty and used other realtors in his property search. (JA 39).  Griffin did not intend to have a formal agreement with any realty company or realtor until he found property he wanted to buy. (JA 40 lns. 10-14).

In 2013, Buddy Bullard, an agent with Coldwell Banker, called Stone to tell him that Coldwell Banker had the Property listed for sale. (JA 110 lns. 16-19).  Coldwell Banker listed the Property for a limited liability company headed towards a foreclosure of the mortgage on the Property and trying to sell it. (JA 110-11).  Griffin first learned about the Property on August 29, 2013, when Stone emailed him a description of it. (JA 41-42, 53).  In September 2013, Griffin traveled to South Carolina to visit the Property. (JA 43-44).

After Griffin's visit, Coldwell Banker called Stone to tell him that Enterprise Bank foreclosed on the Property, effectively terminating Coldwell Banker's efforts to sell it on behalf of the LLC. (JA 112 lns. 6-18). Stone then engaged in

3

communication with Enterprise Bank about Griffin buying the Property from the Bank. (JA 46 lns. 9-13).  At all times Stone took action or negotiated in regard to the Property, he acted as Griffin's agent.  Griffin "wanted to be first in line when Enterprise got the, had title to the piece of property, we wanted to be first in line to purchase the property." (JA 250 lns. 4-7).

On September 11, 2013, Stone emailed Griffin regarding the negotiations with Enterprise Bank.  He wrote:

> I got some assurance from David Johns that he would sit on an offer and not divulge to anyone.  He also indicated that while he would love to extend a loan on the tract to you, that the regulators would probably prohibit him from doing that.  They apparently frown on loans on REO properties that are within the bank's portfolio.

(JA 55).  About a week later, on September 19, 2013, Griffin reviewed a contract of sale with Enterprise Bank drafted by Stone. (JA DKT 57-61).  Stone explained to Griffin the bases for some of the contract terms:

> I rounded off [the purchase price] to $1,220,000 which is actually $2,003/acre. . . .
> I also put in that the bank will pay Coldwell Banker a 4% commission so Buddy will get paid.  We need to execute a buyer's rep agreement outlining my commission.  I would like to see a 6% fee on this one.  Buddy had it listed at $2,500 with a 10% fee and he needs to take a little haircut.

(JA 57).  Stone discussed the Coldwell Banker commission with the Bank, which agreed to it. (JA 114 lns. 1-8).  Stone came up with a commission payment to Coldwell Banker in the amount of 4% of the purchase price because he "thought

4

that was a fair compensation." (JA 114 lns. 19-23). There is no indication that Stone discussed the amount with Coldwell Banker or that Coldwell Banker asserted any right to a commission payment in the proposed, post-foreclosure sale between the Bank and Griffin.

Griffin "didn't exactly understand the foreclosure process" and planned to go to Canada in October for a hunting trip. (JA 44 lns. 13-21). Before leaving for Canada, Griffin "had a contract prepared to go to Enterprise Bank" with a $1,220,000 purchase price and a 4% commission to Coldwell Banker payable by Enterprise Bank. (JA 44 lns. 21-22; JA 58-61). Griffin believed the Bank would get title to the Property after the foreclosure sale. (JA 47 lns. 19-23). He never spoke to anyone at Enterprise Bank but relied entirely on Stone, his agent, to handle the Property purchase. (JA 46-47).

On October 4, 2013, Griffin wrote a check payable to "National Land Realty" in the amount of $50,000.00 for the escrow deposit, in accordance with the terms of the contract he submitted to Enterprise Bank. (JA 65). On that same day, Griffin signed an Exclusive Right to Buy Buyer Agency Contract with National Land Realty, agreeing to pay a commission to Stone in the amount of 6% of the $1,220,000.00 purchase price. (JA 62-64).

## II.     Walker Purchased the Property at the Foreclosure Sale

The foreclosure sale took place three days later, on the morning of October 7, 2013.  To Griffin's surprise, Walker submitted the winning bid at the foreclosure sale of the Property. (JA 20).  Neither Griffin nor Stone, nor any other agent of Griffin, attended the sale. (JA 48).

Walker is a South Carolina licensed real estate broker and owns Walker Accounting & Tax Service, a RE/MAX Real Estate branch, and Appellant Carolina Self Storage Centers, Inc. (JA 68).  He learned about the Property when he read the foreclosure sale notice in the newspaper. (JA 77 lns. 7-10).  He sent an employee to the sale, where she made the high bid of $1,000,001.00 for Walker. (JA 77 lns. 3-11).  When the employee who made the bid "got back to the office and checked with [the] accounts payable manager, [Walker] personally did not have the funds to make that large purchase and Carolina [Self Storage Centers, Inc.] did." (JA 86 lns. 17-20).  Therefore, Walker assigned the bid to Carolina Self Storage. (JA 86).

## III.    The Contract Between Griffin and Walker

About an hour after Walker learned that he made the high bid, Stone called Walker to try to buy the Property.  (JA 72-74).  Stone called Walker before he even told Griffin someone else bought the Property at the foreclosure sale. (JA 48 lns. 1-17).  Walker testified Stone told him "They had no idea I was even bidding.  They were shocked when I got" the Property. (JA 75 lns. 22-23).

Walker testified Stone told him that Griffin agreed to buy the property from Enterprise Bank for $1,175,000.00, rather than the $1,220,000 purchase price. (JA 74-75). Walker agreed to the $1,175,000 purchase price. (JA 75). Stone actually "crunched some numbers and figured out that the contract [Griffin] had in front of Enterprise Bank was going to net Paul Walker $175,000, as it stood" while keeping the commission payment to Coldwell Banker. (JA 116 ln. 25 – 117 ln. 4). Stone never told Griffin that he could purchase the property for $1,175,000.00 instead of $1,222,000.00. (JA 117 lns. 8-10).[1]

Walker "was busy when" Stone called because that time of year was "the second busiest date of the year for accountants." (JA 76 lns. 8-13). Later that same day, Stone, on behalf of Griffin, sent a Contract of Sale to Walker. (JA 77). The contract is the exact same contract Griffin sent to Enterprise Bank except that the Seller's name changed to "Paul E. Walker, Jr.", and the purchase price increased by $2,000.00 from $1,220,000.00 in the Enterprise Bank contract to $1,222,000.00 in the contract sent to Walker. *Compare* JA 58-61 *with* JA 90-93; JA 119 lns. 11-16.

Walker made revisions to the contract and sent it back to Stone. (JA 78-79). The revision Walker made that is at issue on appeal is a revision to paragraph 3 on page 3 of the contract, which addressed the real estate commission to Coldwell

---

[1] Lowering the purchase price would have lowered Stone's commission payment and removed the commission payment to Coldwell Banker. (JA 57, 63).

7

Banker, who previously represented the owner that lost the Property when Enterprise Bank foreclosed on its mortgage. Coldwell Banker neither represented nor had any relationship with Griffin or Walker. (JA 42 lns. 19-25, JA 117 lns. 11-21). The contract version Stone sent Walker read as follows:

> Seller agrees to pay a Real Estate Commission to Coldwell Banker Platinum Partners equal to four (4%) percent of gross purchase price and Purchaser shall not be responsible for any Real Estate Commissions.

(JA 79, 92). Walker revised the provision to read:

> Seller agrees to pay a Real Estate Commission to Coldwell Banker Platinum Partners *of $47,000* and Purchaser shall not be responsible for any Real Estate Commissions. Real Estate Commission only due if property sale closes.

(JA 79, 96) (emphasis added). Walker explained he edited this provision because Stone told him a purchase price of $1,175,000.00 "and then [the] contract he sent me did not come up to the same number." (JA 81 lns. 7-8).

Walker and Griffin signed the contract on October 7, 2013. (JA 312). Griffin emailed a signed copy of the contract to Stone, who signed as a witness to Griffin's signature executed outside of his presence. (JA 49). Stone then counter-executed an Exclusive Right to Buy Buyer Agency Contract with Griffin on October 7, 2013, at 5:00 p.m.—three days after Griffin signed it—thereby entitling Stone to a commission payment of 6% of the inflated $1,222,000.00 purchase price. (JA 62-64).

8

## IV. Walker's Non-Performance of the Contract Due to Public Policy Violations and Misrepresentations

Walker later realized the contract contained misstatements and performance of the contract exposed him to liability. Therefore, he declined to go through with the closing. Walker explained:

> [A] couple days later [Stone] called and said something about they were applying for a loan at AG South, or Farm Credit, or something.[2] And then I got to thinking that price is over inflated, that could be mortgage fraud. And I got to thinking they [Coldwell Banker] didn't even do anything to earn this commission. Then I started thinking about it and then I said, you know, I think this thing's unethical, I think I violated a bunch of real estate laws here, so I said maybe I better get some help. And that's when I called the attorney.

(JA 80 lns. 14-25).

Walker testified the purchase price is misstated and inflated due to the Coldwell Banker commission payment provision. (JA 70). Griffin is actually paying the commission to Coldwell Banker because his agent, Stone, added the commission to the $1,175,000.00 purchase price. (JA 137-38). Walker "didn't have the slightest idea" of Coldwell Banker's role, if any, in the transaction. (JA 83 ln. 14). "I didn't know if that was another company that Tyler Stone owned, I didn't know who Coldwell Banker was." (JA 83 lns. 14-16). Stone "never said who they were." (JA 84 lns. 8-9). Walker explained "I still, to this day, don't know that that's not Tyler, or some friend of his, or somebody else associated with

---

[2] Griffin testified he approached AG South regarding the financing of the purchase. (JA 52 lns. 3-6).

this deal. I don't know." (JA 89 lns. 21-24). Walker testified "the purchase price was 1,175,000. [Stone] moved it up to 1.222 million. . . . to get his $47,000 commission in there for, like I say, somebody I don't even know." (JA 82 lns. 8-12). Stone believed Coldwell Banker should get a commission payment because it brought the Property to his attention prior to the foreclosure and prior to Walker owning the Property. (JA 130).

Walker declined to perform under the contract, and Griffin filed an action to enforce it. On January 1, 2014, Griffin filed an Amended Complaint asserting nine causes of action. (JA 8-18). The only cause of action at issue on appeal is one for specific performance against Appellant Walker. On February 27, 2014, Walker and Carolina Self Storage filed separate Answers to the Amended Complaint, both asserting a counterclaim for a declaratory judgment that the contract is unenforceable and invalid because it violates public policy. (JA 21-28).

The parties filed cross-motions for summary judgment. Walker and Carolina Self Storage asserted Griffin could not prove an action for specific performance because the contract is invalid, he did not partially perform, and the equities do not weigh in favor of granting specific performance. (DKT 38). Griffin argued the contract is valid as written because the parties signed it. (DKT 39).

**V.    The District Court's Decision to Grant Griffin's Summary Judgment Motion and Deny Walker and Carolina Self Storage's Summary Judgment Motion**

The District Court granted Griffin's motion for summary judgment as to specific performance and denied Walker and Carolina Self Storage's motion for summary judgment as to a declaratory judgment. (JA 358-63).  In reaching its decision, the Court made numerous findings that Appellants challenge on appeal.

The Court found performance of the contract did not violate South Carolina public policy. (JA 362-63).  It also found Griffin partially executed the contract because "[a]fter the contract was executed, Plaintiff placed a $50,000 earnest payment in Stone's trust account, hired design professionals to begin designing structures for the property, and hired a[n] attorney to handle the closing of the sale." (JA 361).   Further, the Court found specific performance is equitable between the parties

> since the financial outcome is precisely the same for Defendants if the debated commission were cut from the contract (i.e. Walker/Self Storage would still receive the same $1,175,000 if the sales price were adjusted to that figure and the commission were eliminated).

(JA 361).

Walker and Carolina Self Storage filed a motion to alter or amend arguing (1) misrepresentations in the contract it expose him to civil and professional ethical liability; (2) the Order incorrectly stated Griffin executed the $50,000.00 earnest money check after he entered into the contract with Walker on October 7, 2013,

11

when the check is clearly dated October 4, 2013, and was executed in performance of the proposed contract with Enterprise Bank; (3) Griffin did not partially execute the contract because the check pre-dates the contract and there is no evidence in the record he hired design professionals; and (4) the finding that enforcement of the contract is equitable to Walker is based on an incorrect assumption that the commission provision is severable from the remainder of the contract. (DKT 50 pp. 2-7). The District Court denied Appellants' motion, giving rise to this appeal.

## SUMMARY OF THE ARGUMENT

The District Court erred in finding the contract enforceable and the elements of specific performance satisfied. The contract is unenforceable because performance of it violates South Carolina public policy and exposes Walker to civil and professional disciplinary action. The contract misrepresents the purchase price as $1,222,000.00, which Griffin inflated to provide a commission payment to an uninvolved real estate broker. When Walker realized the misrepresentations in the contract, and the legal and professional implications for him as a real estate broker, he correctly declined to go through with the closing.

The District Court erred in finding Griffin partially executed the contract. It incorrectly relied on a check that predated the foreclosure sale and an unsupported allegation in Griffin's Amended Complaint regarding the hire of design professionals. Finally, the District Court erred in finding the equities weigh in

12

favor of granting specific performance to Griffin.  Enforcement of the contract is not equitable between Walker and Griffin.  However, granting summary judgment for Walker would leave the parties in the exact same position they occupied prior to signing the contract—Griffin retains his money and Walker owns the Property.

## **ARGUMENT**

### **Standard of Review**

This Court "review[s] de novo the district court's disposition of the cross-motions for summary judgment." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013).

> With respect to both motions, [the Court is] required to view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party, in order to determine whether there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

*Id.* at 312-13 (internal quotation marks omitted).  The "court of appeals may direct entry of judgment in favor of the appellant where cross-motions for summary judgment have been filed." *Triton Marine Fuels Ltd., S.A. v. M/V Pacific Chukotka*, 575 F.3d 409, 419 (4th Cir. 2009) (citing *United States v. St. Louis Univ.*, 336 F.3d 294, 304 (4th Cir. 2003)).

## I.    **Griffin Cannot Establish the Elements of Specific Performance**

This Court should reverse the District Court's entry of summary judgment in Griffin's favor because he cannot satisfy two elements of a specific performance

action.  To compel specific performance, a court must find the following elements satisfied:

> (1) there is clear evidence of a ***valid*** agreement; (2) the agreement had been partly carried into execution on one side with the approbation of the other; and (3) the party who comes to compel performance has performed his or her part, or has been and remains able and willing to perform his or her part of the contract.

*Ingram v. Kasey's Assocs.*, 340 S.C. 98, 106, 531 S.E.2d 287, 291 (2000) (emphasis added) (refusing to grant specific performance where plaintiff was unable to perform and acted with unclean hands).  In this case, Griffin cannot prove the first and second elements.  The contract is invalid as against South Carolina public policy, and Griffin did not partly carry the contract into execution with acceptance by Walker.  A finding that Griffin cannot satisfy any one of the two challenged elements warrants reversal of the District Court's orders.

### A.    *The Contract is Invalid as Against South Carolina Public Policy*

"'Whether a contract is against public policy or is otherwise illegal or unenforceable is generally a question of law for the court.'" *Milliken & Co. v. Morin*, 399 S.C. 23, 30, 731 S.E.2d 288, 291 (2012) (quoting 17B C.J.S. *Contracts* § 1030).  "The general rule, well established in South Carolina, is that courts will not enforce a contract when the subject matter of the contract or an act required for performance violates public policy as expressed in constitutional provisions, ***statutory law***, or judicial decisions." *White v. J.M. Brown Amusement Co.*, 360

14

S.C. 366, 371, 601 S.E.2d 342, 345 (2004) (emphasis added). Performance of the contract purchase price and commission payment provisions violates South Carolina statutory law regarding real estate brokers. The contract is therefore invalid and unenforceable as a matter of law.

The South Carolina legislature created the South Carolina Real Estate Commission ("Commission") to regulate the real estate industry. S.C. Code Ann. § 40-57-10 (2011). The Commission's "[p]owers and duties include . . . conducting disciplinary hearings on alleged violations of this chapter and regulations promulgated under this chapter and deciding disciplinary actions as provided in this chapter for those found to be in violation." S.C. Code Ann. § 40-57-60(2) (2011). This Chapter applies to Walker's sale of land for himself as a licensed South Carolina real estate broker. *See* S.C. Code Ann. § 40-57-240(1) (2011) ("This chapter does ***not*** apply to: (1) the sale . . . of real estate by an ***unlicensed*** owner of real estate . . . ." (emphasis added)).

The Commission governs disciplinary actions against licensed real estate brokers.[3] The contract between Griffin and Walker subjects Walker to disciplinary action on numerous bases. The Commission

> may take disciplinary action against a licensee who: (1) makes a
> ***substantial misrepresentation involving a real estate transaction*** . . .

---

[3] *See* § 47-50-30(6) (defining "Commission" as "the group of individuals charged by law with the responsibility of licensing or otherwise regulating the practice of real estate within the State of South Carolina").

15

> (7) makes a dual set of contracts, ***written or otherwise***, by ***stating a sales price higher than the actual sales price*** in an effort to obtain a larger loan from a lender or lending institution or for the purpose of misinforming the government agency ***or any other reason***.

S.C. Code Ann. § 40-57-145 (2011) (emphasis added). In addition to disciplinary action taken by the Commission, "a civil action may be brought for violations of [Chapter 57]." S.C. Code Ann. § 40-57-230 (2011).

The contract exposes Walker to disciplinary action by the Commission and civil liability because it substantially misrepresents the purchase price, the payor of the purported commission, and Coldwell Banker's involvement in the sale—which was none. (JA 126). Further, the contract states a sales price higher than the actual sales price for the purpose of paying a commission to an uninvolved realtor.

"In addition to" the disciplinary grounds in § 40-57-145, the South Carolina legislature granted further disciplinary powers to the Commission, as a regulator of a profession, under Title 40, Chapter 1. S.C. Code Ann. § 40-1-110 (2011). Under § 40-1-110, the Commission

> may cancel, fine, suspend, revoke, or restrict the authorization to practice of an individual who: . . .
> (d) has intentionally used a fraudulent statement in a document connected with the practice of the individual's profession or occupation;
> (e) has obtained fees ***or*** assisted in obtaining fees under fraudulent circumstances.

§ 40-1-110(1)(d)-(e) (emphasis added). Performance of the contract as written could subject Walker to discipline under § 40-1-110 because it contains fraudulent

16

statements as to the purchase price and Coldwell Banker's entitlement to a "Real Estate Commission", and assists in Coldwell Banker obtaining a fee under fraudulent circumstances. (JA 311).

Walker's position is supported by an expert opinion from Professor John P. Freeman, a licensed attorney who currently serves as a Distinguished Professor Emeritus and John T. Campbell Chair in Business and Professional Ethics Emeritus at the University of South Carolina School of Law.[4] (JA 101). Professor Freeman reviewed the facts of this case and reached the following opinion:

> [T]he Contract . . . is false and misleading to the extent that it represents a commission is due to Coldwell Banker. I say this because Coldwell Banker was not employed by either the buyer or seller, performed no services in this matter, and was due no money for services rendered in connection therewith. I further find the Contract . . . is false and misleading to the extent that it represents that the buyer was not responsible for any commission being paid to Coldwell Banker. I say this because it appears that the purported "commission" payment to Coldwell Banker through Mr. Walker was not for a commission at all but simply reflected the routing of cash to Coldwell Banker by [Griffin]'s broker National Land Realty.

(JA 99). In Professor Freeman's opinion, Walker's professional, statutory obligations as a real estate broker required that he not perform under the Contract as written. Therefore, Professor Freeman concluded "the contract in question, due

---

[4] Over his forty-year career, Professor Freeman authored more than twenty-five scholarly articles and made dozens of presentations regarding professional ethics to numerous business sectors including real estate closing attorneys, other legal practice areas, the judiciary, board members, legislative and state employees, advertising, public utilities, and government investigators. (JA 102-05).

17

to the factual misrepresentations . . . , is contrary to public policy and hence is invalid." (JA 100).

The South Carolina statutes[5] cited above evidence that performance of the contract violates South Carolina public policy applicable to licensed real estate brokers such as Walker. Therefore, the Court should find the contract invalid and unenforceable.

The District Court did not directly address Walker's arguments regarding violation of South Carolina statutes. Rather, it held the contract did not violate South Carolina public policy because "although Coldwell Banker . . . may not have been *entitled* to fees, it does not follow that it is in any way *barred* from receiving fees." (JA 362, 367-68). Coldwell Banker's "Real Estate Commission"[6] under the contract is at most an unenforceable gift, which may be revoked at any time prior

---

[5] The Code of Ethics of the South Carolina Realtors Association contains provisions similar to the statutes cited above. For example, realtors "remain obligated to treat all parties honestly"; "should avoid . . . misrepresentation, or concealment of pertinent facts relating to the property or the transaction"; "shall not be parties to the naming of a false consideration in any document"; and "shall be honest and truthful in their real estate communications." (JA 351, 353, 355).

[6] Griffin argued below that the contract makes no representation as to whether Coldwell Banker earned or is owed a commission but, rather, that such a distinction did not matter once the parties signed a document stating Walker would pay Coldwell Banker. (DKT 43 p. 2). This ignores the plain language of the contract, which states "Seller agrees to pay a ***Real Estate Commission***." (JA 311) (emphasis added). The phrase "Real Estate Commission" indicates Coldwell Banker provided some service to the payor that warrants compensation. As explained above, Coldwell Banker provided no such service to Walker and, therefore, is not owed a "Commission."

18

to delivery.[7] *See* 38 Am. Jur. 2d *Gifts* § 66 ("[S]o long as a gift is incomplete, it may be revoked."); *Worrell v. Lathan*, 324 S.C. 368, 371, 478 S.E.2d 287, 289 (Ct. App. 1996) ("The mere intention to give a gift without delivery is unavailing, the intention must be executed by a complete and unconditional delivery." (internal quotation marks omitted)).

There is no legal authority for enforcing the commission payment provision because Coldwell Banker had no involvement in or relationship to the sale ***between Walker and Griffin***.   Once the foreclosure sale occurred, Coldwell Banker's involvement in any sale of the Property terminated.  Any other interpretation of the facts of this case could require commission payments to real estate brokers after multiple sales of property, including involuntary dispositions such as a foreclosure or tax sale. *See, e.g.*, *Richard B. Smith Real Estate v. Knudson*, 691 P.2d 1212, 1214 (Idaho 1984) (refusing to find a real estate commission owed to broker who listed property for sale when sellers transferred it to prior owner by quitclaim deed in lieu of foreclosure).[8]

---

[7] Professor Freeman testified the commission provision is "actually just a gift" because Coldwell Banker did not earn the commission in this transaction between Walker and Griffin, and neither Walker nor Griffin are contractually obligated to pay Coldwell Banker a commission. (JA 169).

[8] *See also* S.C. Code Ann. § 40-57-140(A) (2011) ("A real estate broker and all associated licensees owe no duty or obligation to a client following termination, expiration, completion, or performance of an agency agreement or closing of the real property transaction.").

The District Court's bases for finding the contract enforceable do not directly address South Carolina law discussed above and incorrectly analyze the commission payment provision.  Requiring Walker to perform under the contract violates South Carolina public policy as expressed in statutory law.  Therefore, this Court should reverse the District Court and find the contract unenforceable and invalid.

### B.    *Griffin Did Not Partially Execute the Contract with Approval by Walker*

Even if this Court finds the contract valid, it may still grant summary judgment to Appellants because Griffin cannot prove the second element of a specific performance action—he partly executed the contract with approval by Walker. *Ingram*, 340 S.C. at 106, 531 S.E.2d at 291.  The District Court relied on three acts of alleged partial execution by Griffin: (1) he wrote an earnest money check on October 4, 2013, for the proposed contract with Enterprise Bank; (2) he allegedly hired "design professionals to work on the new property"; and (3) he hired a closing attorney. (JA 359, 366).  The first two do not constitute partial execution of the contract, and the third is insufficient partial execution on its own.[9]

---

[9] The District Court incorrectly stated "that Defendants did not dispute [the closing attorney and design professionals] in their summary judgment filings but contest [them] for the first time in the motion for reconsideration." (JA 366-67). Defendants expressly contested both acts as insufficient proof of partial execution in the Reply to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment. (DKT 44 pp. 4-5).

20

First, the earnest money check is dated October 4, 2013, and Griffin wrote it in preparation for fulfilling a proposed contract *with Enterprise Bank*—a completely separate transaction. (JA 65). Further, the check is dated three days before the foreclosure sale, three days before Walker took title to the Property, and three days before Walker and Griffin even entered into the contract at issue. The District Court found "[t]he fact that Griffin wrote a check for the earnest money shortly in advance of signing the contract does not change the fact that the check fulfilled the requirement in the contract." (JA 366). This addresses only the argument that the check predates the contract at issue. It does not address the fact that the action was taken in regard to a completely separate transaction. The check does not constitute partial execution of the contract at issue between Walker and Griffin.

Second, there is no evidence in the record to support the assertion that Griffin hired design professionals to perform work related to the Property. Griffin makes this allegation in the Amended Complaint, which is insufficient to support an entry of summary judgment in his favor. (DKT 41 p. 6; DKT 43 p. 3). "[N]either unsupported speculation nor evidence that is merely colorable or not significantly probative will suffice to defeat a motion for summary judgment." *Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514, 522 (4th Cir. 2003) (internal quotation marks and citations omitted). Even assuming this allegation is

21

true, it is not "execution" of the contract but, instead, in action taken in "reliance on the Contract" for a property sale that did not close. (JA 10). Further, the Amended Complaint does not state when Griffin supposedly hired design professionals—whether before or after Walker refused to perform under the contract. For these reasons, this Court should not consider the design professionals allegation in its analysis of whether Griffin meets the second element of specific performance.

Third, and finally, the sole remaining fact for the Court to consider is that Griffin hired a closing attorney. The District Court found this sufficient evidence of partial performance by relying on law regarding whether the plaintiff is "ready, willing, and able" to perform—which relates to the third, rather than the second, element of specific performance. (JA 367 (citing *Shay v. Austin*, 466 F. Supp. 2d 664, 669 (D.S.C. 2006))). In *Shay*, the District Court found the contract partly carried into execution "because the transaction was nearly consummated, lacking only a commitment letter from Wachovia [mortgagee] and the wiring of the closing funds to [seller]." *Id.* at 669. The buyer in *Shay* sent a deed and wiring instructions to a seller, and the parties' closing attorneys engaged in correspondence over a number of days regarding the mortgage release. *Id.* at 666-69. In this case, the transaction was not "nearly consummated." Rather, the

parties signed a contract and Griffin hired a closing attorney. This is insufficient to prove partial execution with approval by Walker.

This Court may reverse the District Court's entry of summary judgment in favor of Griffin based solely on the absence of proof of partial execution.

## II.   The District Court Incorrectly Balanced the Equities

Even if this Court finds the contract valid and the elements of specific performance satisfied, it may still reverse the District Court's decision to enter summary judgment in favor of Walker because the equities weigh against ordering specific performance. "A plaintiff must show more than the mere existence of a valid contract to be entitled to specific performance. The court should grant specific performance *only if* [1] there is no adequate remedy at law *and* [2] specific enforcement of the contract *is equitable between the parties*." *King v. Oxford*, 282 S.C. 307, 314, 318 S.E.2d 125, 129 (Ct. App. 1984) (emphasis added). "Specific performance will not be ordered unless the contract expresses the true intent of the parties and is fair, just and equitable . . . [and] where the contract is fair and was entered into openly and aboveboard." *Amick v. Hagler*, 286 S.C. 481, 484-85, 334 S.E.2d 525, 527 (Ct. App. 1985) (internal citation and quotation marks omitted).

The District Court found "enforcement of the contract as written would be equitable to defendants" based on its conclusion that

> the financial outcome is precisely the same for Defendants if the
> debated commission were cut from the contract (i.e. Walker/Self
> Storage would still receive the same $1,175,000.00 if the sales price
> were adjusted to that figure and the commission were eliminated).

(JA 361). This conclusion does not "balance" the equities but, instead, gives

Griffin the unfair advantage of severing an unenforceable contract provision to his

benefit. The District Court's "balancing" is premised on two incorrect

assumptions: (1) the commission provision, if unenforceable, may be severed from

the contract, and (2) severing the commission provision would automatically

change the purchase price to $1,175,000.

As to the first assumption, the contract has no severability provision and the

court may not rewrite the parties' contract to omit the offending provision. *See*

*Lowcountry Open Land Trust v. Charleston S. Univ.*, 376 S.C. 399, 410, 656

S.E.2d 775, 781 (Ct. App. 2007) ("Courts only have the authority to specifically

enforce contracts that the parties themselves have made; they do not have the

authority to alter contracts or to make new contracts for the parties.").

As to the second assumption, even if the Court could sever the provision, the

"total sales price" is still "$1,222,000.00." (JA 309). Therefore, "if the debated

commission were cut from the contract," as hypothesized in the District Court's

Order, the purchase price would still be $1,222,000.00, not $1,175,000.00. (JA

361).

In response to these arguments in Walker's Motion to Alter or Amend, the District Court explained it "reviewed Walker's financial position with and without the disputed commission" and found that because the "commission was to be paid by the seller, Walker's interests were unchanged" by the commission payment provision because he would still receive $1,175,000. (JA 367). If this is true, then the District Court's analysis assumes the purchase price would change if the commission provision is removed, which means that the commission provision is really paid by Griffin rather than by Walker. This analysis proves Walker's argument that the District Court's reasoning for its finding that specific performance is equitable between the parties depends upon substantive changes to numerous terms of the contract. Such reasoning and rewriting cannot support an order of specific performance.

Griffin, as principal for Stone, is responsible for all of Stone's action and inactions related to the contract. The contractual representation to Walker that Coldwell Banker is due a "Real Estate Commission" relating to this transaction is a misrepresentation attributable to Griffin.

> In every such case the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency. . . . Seeing that some one [sic] must be loser by the deceit, it is more reasonable that he who employs and confides in the deceiver should be the loser than a stranger.

*Spence v. Spence*, 368 S.C. 106, 126-27, 628 S.E.2d 869, 880 (2006) (internal quotation marks omitted). Griffin, by virtue of his agent, knew that Walker was without knowledge of Coldwell Banker's lack of involvement in the sale between Walker and Griffin, and without knowledge of the absence of any relationship between Coldwell Banker and Griffin. If Walker knew the true state of the relationships between Griffin, Stone, and Coldwell Banker, he would not have signed a provision representing he owed a $47,000.00 "Real Estate Commission" to an entity with no connection to the sale. Walker testified that, when he realized Coldwell Banker was uninvolved in the transaction, he knew there may be legal and professional disciplinary repercussions to performing the contract. (JA 80).

The District Court incorrectly balanced the equities in this case by relying on substantive alterations to the contract to support its analysis. The equities weigh against ordering specific performance because the contract does not express the true terms of performance of the purchase price and commission provision.

## CONCLUSION

The District Court erred in finding Griffin satisfied the elements of specific performance and enforcement of the contract is equitable. Enforcing the contract as written violates South Carolina statutory law. Further, the record does not support a finding of partial execution, and the District Court's reasoning as to the equities of enforcing the contract is based on incorrect assumptions and an

26

improper rewriting of contract terms.  This Court may reverse and enter summary judgment in Appellants' favor if it agrees as to any one of these issues.

For these reasons, the District Court orders granting summary judgment to Appellee Griffin should be reversed, and this Court should enter summary judgment in favor of Appellants Walker and Carolina Self Storage.

Respectfully submitted,

                                        BARNES LAW FIRM, LLC

BY:   s/ Kathleen C. Barnes                    .
                        Kathleen C. Barnes
                        Fed ID # 11482
                        kbarnes@barneslawfirmsc.com
                        Post Office Box 897
                        Hampton, South Carolina 29924
                        Phone: (803) 943-4529

May 11, 2015
Hampton, South Carolina              *Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>6,519</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated:  May 11, 2015          <u>/s/ Kathleen C. Barnes</u>
                              Kathleen C. Barnes

                              *Counsel for Appellants*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on May 11, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219